**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON**

**ELIZABETH CRAWFORD,**

   **Plaintiff,**

**vs.**            **Civil Action No. 2:18-01215**

**UNITED STATES OF AMERICA,**

   **Defendant.**

**MEMORANDUM IN SUPPORT OF
<u>UNITED STATES OF AMERICA'S MOTION FOR SUMMARY JUDGMENT</u>**

**I.**   **INTRODUCTION**

In this dog bite case, Plaintiff's case for liability rests on a list of Chuck Norris jokes found on the internet.   Plaintiff filed this lawsuit against the United States claiming that a small dog bit her on the hand while she visited U.S. Representative Tom McClintock's office on January 24, 2013.   Plaintiff's claims must fail because she has produced no evidence that the dog had a prior history of unprovoked aggression toward the public.   The dog, a dachshund-Chihuahua mix named Who Dey, was owned by Rep. McClintock's staffer Chris Tudor.   Who Dey had been a daily fixture around the office for approximately two years prior to the alleged bite, and he never demonstrated any signs of unprovoked aggression.   In fact, the evidence Plaintiff has produced allegedly supporting a history of aggression is a photo contest entry in which Chuck Norris jokes and quotes from "the most interesting man in the world" were appropriated to describe Who Dey's imaginary exploits such as "sharks have a week dedicated to him," and "he is the life of parties he has never attended."   While Who Dey was a few months overdue for his rabies vaccination, Plaintiff has produced no evidence that Who Dey ever had rabies, or that this delinquency had any

causative connection to her alleged injury.  Accordingly, there is no genuine dispute as to any material fact in this matter, and the United States is entitled to judgment as a matter of law in its favor on all of Plaintiff's claims pursuant to Rule 56 of the Federal Rules of Civil procedure.

## II.    BACKGROUND

### A.   "Friendly, Loving, and Sweet" Dog Becomes Fixture of Congressional Office

In late 2010 or early 2011, Chris Tudor, a staffer for U.S. Representative Tom McClintock, brought his dog Who Dey to work with him at the Cannon House Office Building in Washington, D.C.   Upon interacting with Who Dey, Rep. McClintock encouraged Mr. Tudor to bring Who Dey to work more often.  Who Dey then began coming to the office on a daily basis.  *See* Defendant's Responses to Plaintiff's First Set of Interrogatories, attached hereto as **Exhibit A** at Interrogatory No. 19.   Who Dey soon became a favorite of staff and visitors alike.  Who Dey was known by staff to be "friendly, loving and sweet," and had no history of vicious tendencies or unprovoked bites.  *See* Declaration of Kristen Glenn Hamman, attached as **Exhibit B**; Declaration of Chris Tudor, attached hereto as **Exhibit C**.  The only marks against Who Dey stemmed from being terrified of the vet, one episode of "snipping" at a staffer who hurt him while attempting to rip a sticky mouse trap out of his fur, and being compared to Chuck Norris and "the most interesting man in the world" in a photo contest.  *See* **Ex. C**, Declaration of Chris Tudor; **Ex. B.**, Declaration of Kristen Glenn Hamman.  None were suggestive of a generally aggressive or vicious nature or a likelihood that he would ever bite a member of the public.

### B.  Who Dey is Compared to Chuck Norris in Photo Contest

Sometime around May, 2011, Who Dey was entered into a photo contest organized by the Humane Society of America for congressional pets.  Part of the contest entry asked "why my pet should win by a landslide."  *See* Humane Society Photo Contest Entry attached as **Exhibit D**.  In

order to make the entry interesting and humorous, a staffer in Rep. McClintock's office borrowed from Chuck Norris jokes and quotes from Dos Equis ads found on the internet.  **Ex C**, Tudor Declaration.  The contest entry humorously described Who Dey as follows:

> 1. He once challenged his own reflection to a staring contest. On the 4th day, he won.
>
> 2. If he rides with you in your car, its resale value will instantly increase.
>
> 3. He is the life of parties he has never attended.
>
> 4. He lives vicariously through himself.
>
> 5. Sharks have a week dedicated to him.

**Ex. D**, Humane Society Photo Contest Entry.  Similar versions of these tropes can still be easily found on the internet. *See e.g.*, printout from ChuckNorris.io, attached as **Exhibit E** ("Sharks have a week dedicated to Chuck Norris"); printout from BrandonGaille.com listing Dos Equis Commercial Sayings and Quotes, attached as **Exhibit F** ("He is the life of parties he has never attended;" "He lives vicariously through himself;" "He once challenged his own reflection to a staring contest on the third day he won.").  It should go without saying that these quotes where not intended to be taken literally or to suggest some underlying malice on the part of Who Dey.  **Ex. C**, Tudor Declaration.

### C. Who Dey was Once Provoked to Snip at a Staffer Who was Ripping a Sticky Mouse Trap from His Fur.

At some point approximately two years after Who Dey began frequenting Rep. McClintock's office, he accidentally sat in a sticky mouse trap and got it stuck to his fur.  Rep. McClintock's Legislative Director, Kristen Glenn Hamman, attempted to remove the trap form Who Dey's fur.  Provoked and hurt by her actions, Who Dey turned and "snipped" at her hand, but did not break her skin or injure her.  *See* **Ex. B**, Declaration of Kristen Glenn Hamman.  Ms.

Hamman has certified that "it was clear to me under the circumstances that I had provoked this natural reaction."  Ms. Hamman further states that "[t]hroughout my association with Who Dey, he was nothing but friendly, loving, and sweet.  I never observed any evidence of vicious tendencies by Who Dey toward myself, staff in Rep. McClintock's office, or members of the public."  *Id.*

### D.  Plaintiff Visits Rep. McClintock's Office on January 24, 2013.

On January 24, 2013, Plaintiff Elizabeth Crawford visited U.S. Representative Tom McClintock's office to discuss pending legislation.  E. Crawford Dep. at 10, attached hereto as **Exhibit G**.  She testified in her deposition that she sat down in the office's waiting room and read over documents she brought with her.  While waiting, she dropped her pen on the floor.  Without looking at the floor, Plaintiff reached down with her right hand to pick up her pen and felt a sharp pain in her fingers.  *Id.* at 26.  Plaintiff did not actually observe the bite, but noticed the dog only after the fact.  *Id.* at 57-58.  After seeing Who Dey, Plaintiff concluded that she had been bitten. *Id.*  No one else witnessed the bite.  *See* February 1, 2013 email from Lauren Bullard to Cynthia Judson, attached as **Exhibit H**, February 1, 2013 email from Cynthia Judson to Igor Birman attached as **Exhibit I**.  Following the alleged bite, Plaintiff continued to her meeting with staffer Cynthia Judson.  *See* Cynthia Judson Timeline attached as **Exhibit J**.

### E.  Although he was Behind on his Shots, Who Dey did not have Rabies.

It was initially believed that Who Dey was current on all of his shots, but it was later determined that he was actually a few months late for his rabies shot.  Who Dey was taken to the veterinarian on February 6, 2013, and the veterinarian has confirmed that he never had rabies.  *See* Declaration of Dr. Daniel Murphy, attached as **Exhibit K**.  Plaintiff has admitted that she does not know whether the status of Who Dey's rabies vaccine caused any injury or caused him to bite her.

*See* E. Crawford Dep. at 53-54 ("Q. Okay. Do you have any reason to believe that the status of Who Dey's rabies vaccine caused him to bite you? A. I don't know.").  Plaintiff has not presented any expert report or testimony to the contrary.

### F.  Plaintiff Files a Lawsuit and Cites Chuck Norris Jokes as Evidence of Liability.

Plaintiff filed her original Complaint quickly followed by an Amended Complaint and Second Amended Complaint.  In the Second Amended Complaint, Plaintiff alleges that the U.S. House of Representatives breached its duty to keep and maintain the premises in a reasonably safe condition (Count I); that Chris Tudor was negligent by failing to properly restrain and immunize Who Dey (Count II); and that Tudor was negligent *per se* for violating D.C.'s rabies vaccination ordinance (Count III).  Count IV, titled "respondent superior" alleges that the House of Representatives is Tudor's employer, making it responsible for his alleged wrongful acts.

In interrogatories, the United States asked Plaintiff to "[s]tate all of the evidence you claim supports your allegation defendant or any of its employees had knowledge of any vicious or dangerous propensities of Who Dey prior to the date of the incident contained in your Complaint." Plaintiff responded by citing the mouse trap incident described above and Chuck Norris/Dos Equis jokes contained in Who Dey's photo contest entry:

> The dog's owner, Chris Tudor, boasted on social media the dog stares down his own reflection and also stated sharks have a week dedicated to the dog.  The dog bit a congressional staffer when she tried to pull mouse glue stuck to its body. The dog bit the plaintiff as she was merely reaching under her chair in the congressional anteroom as plaintiff was unaware dog was even there."

Plaintiff's Response to Defendant's Interrogatory No. 16, attached hereto as **Exhibit A**.

In her deposition, Plaintiff admitted that she could not say whether Who Dey's reaction to having a sticky mouse trap ripped from his fur illustrated viciousness.  E. Crawford at 31 ("Related to that incident, there again, I'm not an animal behavior specialist, so I cannot say.").  She doubled

down, however, on her insistence that Who Dey's photo contest entry did.  Upon questioning by

her counsel, Plaintiff explained why each statement in Who Dey's photo contest entry

demonstrated a knowledge of vicious propensities.  Plaintiff explained that the claim that Who

Dey won a staring contest with his own reflection indicated "Who Dey's propensity for violence

or aggressiveness" because "it shows that he don't give up. And he might be someone what – he

doesn't give up and he's persistent.  It's aggressiveness."  E. Crawford Dep. at 126.   Regarding

Who Dey causing a car's resale value to increase, Plaintiff testified that it suggested a tendency

toward violence because "Well, it sounds like to me the dog has a lot – is very strong-willed."  *Id.*

at 127.   Plaintiff testified further that "Well, for someone to be the life of the party they've never

attended, they must have something – they must be very dynamic. Dynamic dog, a dog there again

that's strong-willed, a dog that is mean, that just doesn't give up." *Id.* at 128.   Regarding Who Dey

living vicariously through himself, Plaintiff testified it demonstrated violence because "Sounds

like he is a dog, there again, that's going to get his way. He's pushy, he's aggressive." *Id.*  at 128.

Finally, Plaintiff presented Who Dey's relationship with sharks as evidence for her case:

> Q. Okay. 5, "Sharks have a week dedicated to him" -- Who Dey --
> "age two to five years." I don't know if that's part of the statement
> or not, but what I just read, does that indicate an indication from
> the owner of the dog's aggressiveness or propensity for violence?
>
> A. Yes.
>
> Q. Why would that be?
>
> **A. Sharks, in my opinion, are very mean, they are very**
> **dangerous. And if a dangerous shark is dedicating a week to**
> **this dog, then this dog is someone that they look up to, so this**
> **dog must be as aggressive, if not more aggressive than a shark**
> **or more vicious.**

6

Crawford Dep. at 127-129.  Plaintiff admitted that other than the mouse trap incident, Who Dey's photo contest entry was the only evidence that Tudor had prior knowledge of any alleged vicious tendencies on the part of Who Dey.  *Id.* at 37.

## III.    STANDARD OF REVIEW

### A.    Summary Judgment

The entry of summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 884 (1990)(citations omitted).  In determining whether summary judgment should issue, the facts and inferences from these facts are viewed in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

The burden is placed on the moving party to establish the absence of a genuine issue of material fact and that they are entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the non-moving party may not rest on the allegations in its pleadings.  Instead, the non-moving party must set forth specific facts showing that a genuine issue of material fact exists through use of affidavit and other evidence.  *Lujan*, 497 U.S. at 884.  Thus, the non-moving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587 (citations omitted).

**B.      Applicable Law Under the FTCA**

The United States cannot be sued without a waiver of its sovereign immunity.  *United States v. Orleans*, 425 U.S. 807, 814 (1976).  The FTCA partially waives sovereign immunity and allows suits against the United States for personal injuries caused by governmental employees acting within the scope of their employment.  *See* 28 U.S.C. § 1346(b), § 2671, *et seq*.  Under the FTCA, a plaintiff may recover monetary awards from the United States for injury, property loss, or death "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope . . . of employment." *See* 28 U.S.C. § 1346(b).  The United States may be held liable only if the conduct complained of amounts to negligence "in accordance with the law of the place where the act or omission occurred." *Id*.  Thus, liability under the FTCA is governed by the law of the state where the incident occurred.  *Rayonier Inc. v. United States*, 352 U.S. 315 (1957); *Myrick v. US*, 723 F.2d 1158 (4th Cir. 1983) ("In actions brought under the FTCA, federal courts apply the substantive law of the state in which the act or omission giving rise to the action occurred.").  In this case, Plaintiff's alleged injury occurred in Washington, D.C.  Accordingly, the substantive law of the District of Columbia governs this matter.

## IV.      ARGUMENT

### A.  The United States Cannot be Liable because Who Dey's Owner had no Knowledge of Alleged Vicious Tendencies.

The District of Columbia follows the common law rule that "as a rule, the owner of a dog is not liable for its biting a person unless the owner has reason to know that the dog is likely to do so." *Karlow v. Fitzgerald*, 288 F.2d 411, 412 (D.C. Cir. 1961).  *See also Nelson v. United States*, 633 F. Supp. 1263, 1267 (D.D.C. 1986), *aff'd*, 838 F.2d 1280 (D.C. Cir. 1988) ("In the District of Columbia, a dog owner is liable for any foreseeable harm inflicted by the animal if he knows or should know that the dog possesses some dangerous propensity.").  As demonstrated by

8

the attached declarations of those who knew and regularly interacted with Who Dey, he was not known to be vicious, but was described as "nothing but friendly, loving, and sweet."  Declaration of Kristen Glenn Hamman, attached as **Exhibit B**.

Chris Tudor, Who Dey's owner, was aware that Who Dey was scared at the veterinarian's office due to a traumatic experience early in his life, but over eight years as a regular occupant of Rep. McClintock's office "Who Dey has demonstrated a generally calm and pleasant demeanor and has not exhibited vicious tendencies toward myself, staff in Rep. McClintock's office, or members of the public."  **Ex. C**, Declaration of Chris Tudor.  Under D.C. law, Tudor cannot be liable for his dog's alleged bite because there is simply no evidence he knew Who Dey was likely to bite the Plaintiff.   The United States, by extension, has waived its sovereign immunity only "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." Nelson v. United States, 838 F.2d 1280, 1282 (D.C. Cir. 1988).  Because Chris Tudor could not be held liable for the alleged bite under D.C. law, the United States is entitled to summary judgment in its favor.

**B.  Plaintiff's Premises Liability Claim Must Fail Because She has Not Identified any Government Employee with Responsibility for the Premises who had Knowledge of Alleged Vicious Tendencies.**

Plaintiff has simply failed to develop any evidence supporting her premises liability claims. Plaintiff alleges in Count I of her Second Amended Complaint, styled "Premises Liability against U.S. House of Representatives," that the "U.S. House of Representatives, through its agents and employees" owed a duty to "keep and maintain the Premises in a reasonably safe condition," to "warn invitees on the Premises of any unreasonable, unsafe or dangerous conditions which are known to, or should be known to, Defendant and/or its agents or employees," and "to prevent a vicious dog without current rabies vaccination on the Premises." Plt.'s Second Amended

Complaint at ¶ 15.  Plaintiff alleges generally that the House of Representatives breached this duty when it "failed to control the dog and failed to warn the Plaintiff of its existence." *Id.*  Plaintiff has never identified any individual government employee or category of employees who had knowledge of any vicious tendencies by Who Dey or who allegedly owed or breached the duties alleged.

Count I of Plaintiff's Complaint must fail because Plaintiff has failed to identify any "employee of the government" who allegedly owed or breached the premises liability standards identified.  "Our case law establishes that an owner of property has a duty to exercise reasonable care to cure a dangerous condition if (1) he has actual or constructive notice of the condition and (2) he has the right to exercise control over the condition." *Campbell v. Noble*, 962 A.2d 264, 266 (D.C. 2008).    Pets, however, are not like defects in sidewalks which are apparent through reasonable inspection.  Nowhere in the applicable law is a duty imposed on a premises owner to proactively examine each pet on their premises to determine whether or not they might become dangerous.  Instead, domesticated animals like dogs or cats are *presumed* by the law to be safe until they are proven to be otherwise. *See Karlow v. Fitzgerald*, 288 F.2d 411, 412 (D.C. Cir. 1961) ("a domesticated animal, such as a dog…in the generality of cases is deemed to be 'harmless'").  Accordingly, in each reported case applying D.C. law to similar circumstances, the courts have found the landowner's actual knowledge of a tenant's dog's vicious tendencies to be an essential prerequisite to liability. *See Campbell v. Noble*, 962 A.2d 264, 266 (D.C. 2008) ("Dr. Noble had seen the dogs himself, he had received complaints from a neighbor regarding the dogs' behavior, and he had written a letter warning Mr. Harris that the dogs could prove to be a legal and financial liability."); *Nelson v. United States*, 838 F.2d 1280, 1286 (D.C. Cir. 1988) ("Rocky, a dog who had twice previously attacked children, was a condition on the landholder's property

10

which was dangerous to children. Moreover, the landholder had actual knowledge of the condition and a reasonable opportunity to correct it.").

In order to succeed in her premises liability claims, therefore, Plaintiff must rebut the presumption that Who Dey was safe by proving that some discrete government employee with responsibility for the safety of the premises had actual knowledge that Who Dey represented a dangerous condition.  This she has failed to do.  It is well established that "[t]he alleged tortfeasor's status as an 'employee of the government' is the *sine qua non* of liability under the FTCA."  *Means v. United States*, 176 F.3d 1376, 1379 (11th Cir. 1999).  In this case, however, no evidence has been developed of what employee or office was allegedly responsible for the general safety of the Cannon House Office Building, whether such individuals were employees of the government or independent contractors, or pursuant to what authority they allegedly assumed such duties.  Most importantly, there is no evidence that any of them had prior knowledge of Who Dey or any other pet maintained by congressional staff.

Without any evidence that any employee of the government committed a negligent or wrongful act, there is simply no basis for waiving the sovereign immunity of the United States or imposing liability.  It is well established that "[a] party bringing suit against the United States bears the burden of proving that the government has unequivocally waived its immunity." *Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 575 (D.C. Cir. 2003).  *See also*, *Hafen v. Pendry*, 646 F. Supp. 2d 159, 160 (D.D.C. 2009) ("The burden rests with the plaintiff to demonstrate the government's waiver of immunity."); *Scruggs v. Bureau of Engraving & Printing*, 200 F. Supp. 3d 78, 82 (D.D.C. 2016) ("plaintiff bears the burden of establishing that sovereign immunity has been abrogated.").  Further, "sovereign immunity bars suit against the United States except to the extent that it consents to be sued" and "statutory waivers of sovereign immunity 'are

11

to be construed strictly in favor of the sovereign.'" *Id., citing United States v. Mitchell,* 445 U.S. 535, 538, 100 S. Ct. 1349, 63 L.Ed.2d 607 (1980); *Powers v. United States,* 996 F.2d 1121, 1124 (11th Cir.1993); *McMahon v. United States,* 342 U.S. 25, 27, 72 S. Ct. 17, 96 L. Ed. 26 (1951). Because Plaintiff has failed to identify any employee of the government with duties to maintain the safety of the premises and knowledge of alleged vicious tendencies of Who Dey, sovereign immunity bars her claims.

**C. Plaintiff's Negligence *Per Se* Claims Must Fail Because there is No Evidence Who Dey Ever Had Rabies.**

In Count III of Plaintiff's Second Amended Complaint, Plaintiff alleges that "Tudor's failure to have 'Who Dey' immunized for Rabies is a violation of the regulation and constitutes negligence per se." Under District of Columbia law, a defendant is considered negligent as a matter of law where three conditions are met: (1) the defendant violated some law or regulation, (2) the plaintiff's alleged injury was proximately caused by the violation, and (3) the law was intended to prevent the type of injury alleged. *McNeil Pharm. v. Hawkins*, 686 A.2d 567, 578 (D.C. 1996). Plaintiff's negligence per se claims must fail because there is no evidence that Who Dey ever had rabies, that the Plaintiff was ever exposed to rabies, or that the rabies vaccination regulation was ever intended to generally prevent dog bites.

In *Iacangelo v. Georgetown Univ.*, 595 F. Supp. 2d 87, 93 (D.D.C. 2009), the United States District Court for the District of Columbia, applying D.C. law, recognized that "An essential element of any negligence claim is proof that the alleged breach of duty at issue proximately caused the harm at issue. Thus, to succeed on negligence *per se* claims, 'plaintiffs must prove that *the statutory violation* was the proximate cause of their injuries.'" *Iacangelo v. Georgetown Univ.*, 595 F. Supp. 2d 87, 93 (D.D.C. 2009), *quoting Rong Yao Zhou v. Jennifer Mall Restaurant, Inc.*, 534 A.2d 126, 1277 (D.D.C. 1987) (emphasis supplied by the *Iacangelo* court). *Incangelo* was a

medical malpractice case in which the plaintiff alleged negligence *per se* as a result of the defendant doctors' use of certain medical devices that lacked FDA approval. The court rejected the Plaintiff's argument that this constituted negligence *per se*, recognizing that "it is no more logical to infer a causal connection between Histoacryl's and Lipiodol's unapproved status and Ms. Kerris' injuries than it is to infer a causal connection between a driver's lack of a drivers license and injuries he causes while driving." *Iacangelo v. Georgetown Univ.*, 595 F. Supp. 2d 87, 93 (D.D.C. 2009). The same logic applies here.

Plaintiff has presented no evidence at all that the status of Who Dey's rabies vaccine caused Who Dey to bite her. Nor has she presented any evidence that she contracted rabies as a result of the alleged bite. In fact, Who Dey's long time veterinarian has acknowledged that Who Dey has never had rabies. *See* Declaration of Dr. Murphy, attached hereto as **Exhibit J**. Accordingly, there is no evidence that Plaintiff's alleged injury had any causal relationship with Who Dey's vaccine status. Nor is there any evidence that the regulation in question was even intended to prevent the type of injury Plaintiff claims.

The regulation Plaintiff cites is as follows:

> 901.1 Each year, during the period from the last Monday in April through the following Saturday, each person in the District of Columbia who owns, keeps, or has custody of a dog that is three (3) months old or older shall have the dog vaccinated against rabies by a licensed veterinarian.

D.C. Mun. Regs. tit. 24, § 901. This regulation logically could have been intended to protect the public from exposure to rabies, or possibly to protect other animals and pets from contracting rabies from infected dogs. What the regulation is obviously not intended to do is to protect the public from possible injury from the dog bites in general. Because there is no evidence of

proximate cause, and the regulation at issue was not intended to cover the type of injury alleged, the United States is entitled to summary judgment in its favor on Count III.

**D. Plaintiff's Claim for Respondeat Superior Must Fail Along with the Underlying Claims.**

Count IV of Plaintiff's Second Amended Complaint claims "Respondent Superior" as an independent cause of action against the U.S. House of Representatives as Chris Tudor's employer. The United States has conceded that Chris Tudor was acting within the scope of his governmental employment in bringing Who Dey to Rep. McClintock's office.  However, because only the United States is now a Defendant in this action, and because FTCA liability relies on the doctrine of *respondeat superior*, Count IV is simply redundant.  *See Nelson v. United States*, 838 F.2d 1280, 1282–83 (D.C. Cir. 1988)(recognizing that state law of *respondeat superior* defines "scope of employment" for purposes of FTCA liability).  Without question, the scope of the United States' liability under the FTCA cannot extend further than a private person's liability under the same circumstances, and cannot be more expansive than the fault of its employee. *See* 28 U.S.C. § 1346. Because Chris Tudor is not liable for Plaintiff's alleged injury under the laws of the District of Columbia, and no other employee of the government has been identified, there is simply no liability to attach to the United States in this matter.

WHEREFORE, for the reasons stated herein and the reasons stated in defendant's Motion for Summary Judgment, judgment should be entered in favor of the United States of America.

Respectfully submitted,

MICHAEL B. STUART
United States Attorney


**s/Gregory P. Neil**
Gregory P. Neil (WV Bar No. 11077)
Assistant United States Attorney
Fred B. Westfall, Jr. (WV Bar No. 3992)
Assistant United States Attorney
P.O. Box 1713
Charleston, WV 25326
Phone: 304-345-2200 Fax: 304-347-5443
E-mail: fred.westfall@usdoj.gov
        greg.neil@usdoj.gov
*Counsel for United States of America*

15